IN THE UNTIED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| STACY A. BONCIC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CIV-19-23-SLP |
| | ) | |
| PERMANENT GENERAL ASSURANCE CORPORATION, | ) ) | |
| GENERAL AUTOMOBILE INSURANCE SERVICES, INC., and | ) ) | |
| AUDATEX NORTH AMERICA, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**O R D E R**

Before the Court is the Motion to Dismiss [Doc. No. 19] filed by Defendant Audatex North America, Inc. It is at issue. *See* Resp., Doc No. 21; Reply, Doc. No. 22.[1]

**I.   Background**[2]

Plaintiff Stacy Boncic obtained collision and comprehensive insurance coverages for her vehicle from Defendant Permanent General Assurance Corporation (PGAC). The comprehensive coverage included losses caused by floods. Plaintiff asserts that the total due to her from PGAC was controlled by the following portion of her insurance policy:

---

[1] The Court has not considered the NADAguides Value Report attached to Defendant's response brief as Doc. No. 21-1. *See GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997).

[2] The factual summary herein is taken from Plaintiff's Petition [Doc. No. 1-2] and accepted as true for the purpose of deciding Audatex's motion. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The non-Audatex-related circumstances of PGAC and GAIS's handling of Plaintiff's insurance claim are not determinative of the instant motion, and they are not included herein.

> For a loss covered under [the physical damage section of the insurance policy], we will not pay more than our Limit of Liability which is the lesser of:
>     a.     The actual cash value, at the time of loss, of the damaged or stolen auto, or its parts if the loss is limited to parts;
>     b.     The amount necessary to repair physical damage to the auto, or its parts if the loss is limited to parts, to return it to its pre-loss physical condition. No amount for any diminution of value or other change in market value of the auto will be included in, or paid with, the amount to repair;
>     c.     The amount necessary to replace the damaged or stolen auto, or its parts if the loss is limited to parts, with that of like kind and quality; or
>     d.     Any stated limit of liability, as shown on the declarations page, for loss to custom furnishings and equipment for which you have paid the extra premium for custom furnishings and equipment coverage.

Okla. Auto Policy 20, Doc. No. 1-2 (bold emphasis omitted) (Exhibit No. 1 to Plaintiff's state-court-filed Petition). Per the insurance policy, "'[a]ctual cash value' means, at the time of the accident or loss, the fair market value of the stolen or damaged property. The fair market value is affected by: a. The age, mileage and physical condition of the property; and b. Depreciation and prior damage; which may reduce value." *Id.* at 4 (bold emphasis omitted).

On September 3, 2018, Plaintiff's vehicle flooded with salt water in Galveston, Texas. Plaintiff subsequently submitted an insurance claim to PGAC and Defendant General Automobile Insurance Services, Inc. (GAIS) The specific relationship between these defendants is unclear, though Plaintiff treats them as partners in the insurance claim-handling process (as the Court will do in deciding Audatex's motion). PGAC and GAIS eventually declared Plaintiff's vehicle to be a total loss.

In handling Plaintiff's insurance claim, PGAC and GAIS utilized Autosource—a software program owned by Audatex that it sells and/or licenses to insurers—to determine

2

the "market value" (also described as the "market driven value") of Plaintiff's vehicle. *See* Autosource Market-Driven Valuation 2, Doc. No. 1-2 (Exhibit No. 6 to Plaintiff's state-court-filed Petition). In addition to evaluating the condition of various portions of Plaintiff's vehicle (e.g., mileage, seats condition, glass condition, engine condition, and transmission condition) and making adjustments to a base price for any other-than-expected wear or damage (which Plaintiff challenges), the Autosource valuation determines a vehicle's local market value based on the prices associated with other automobiles pulled from "dealer inventories, dealer advertisements, phone verified vehicles, and private party advertisements from thousands of sources including automotive publications, newspapers and Web sites." *Id.* Plaintiff asserts that these comparator vehicles were not, in fact, comparable—resulting in undervaluation of her vehicle by Autosource and underpayment of the amount due to her by PGAC. Plaintiff also asserts that the Autosource valuation's adjustment of advertised prices of comparator vehicles for "typical negotiation" price decreases (approximately 5% of the comparators' advertised prices) resulted in undervaluing the comparator vehicles, thereby undervaluing her vehicle, and proposed or actual payment to her of less than actual cash value for her vehicle.[3] *See* Pet. ¶ 17, Doc. No. 1-2. Plaintiff also faults the Autosource valuation with inadequate explanation of how comparator vehicles' values are calculated, and she alleges that "[t]he intent and effect of the Autosource valuation is to intentionally obscure the most

---

[3] It is unclear if any payment has been made to Plaintiff by PGAC. *See* Pet. ¶ 45, Doc. No. 1-2 (indicating "[t]hat Plaintiff made demand on [PGAC] for payment of the policy benefits" and that "PGAC has refused to pay the benefits due for the [insurance] claim").

3

controversial aspects of the valuation and mislead insureds concerning the quality of the evaluation and the unlawfulness of key aspects of the [Autosource v]aluation." *Id.* ¶ 19.

Based on the Autosource valuation, PGAC and GAIS determined the fair market value of Plaintiff's vehicle (not taking into account her deductible) was $20,338. Plaintiff alleges that this amount undervalued her vehicle by $2,254 to $2,429.

Plaintiff asserts five causes of action—two of which (breach of contract and unjust enrichment) are asserted against PGAC alone, two of which (breach of the duty of good faith and fair dealing (i.e., the tort of bad faith) and fraud/constructive fraud/negligent misrepresentation) are asserted against PGAC and GAIS, and the last of which (tortious interference with a contract) is asserted against GAIS and Audatex.[4] Only the tortious interference with a contract claim against Audatex is at issue in the instant motion. The agreement allegedly interfered with by Audatex is the contract of insurance entered into by Plaintiff and PGAC.

## II. Pleading standard

In considering a motion to dismiss pursuant to Rule 12(b)(6), a court must determine whether the plaintiff has stated a claim upon which relief may be granted. Under Rule 8(a)(2), a pleading is to contain "a short and plain statement of [each] claim showing that the pleader is entitled to relief." While Rule 8(a)(2) "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

---

[4] Audatex indicates that Plaintiff's unjust enrichment claim is against both PGAC and GAIS. *See* Mot. 3, Doc. No. 19. The Petition shows that claim to be against PGAC alone.

4

555 (2007)). As such, "labels and conclusions" and "a formulaic recitation of the elements of a cause of action" are insufficient. *Twombly*, 550 U.S. at 555. In essence, a plaintiff must "nudge[] [her] claim[] across the line from conceivable to plausible" in order to survive a motion for dismissal. *Id.* at 570.

To assess the sufficiency of a claim made by a plaintiff, a two-pronged approach is deployed. First, "a judge ruling on a defendant's motion to dismiss a complaint must accept as true all of the factual allegations contained in the complaint." *Twombly*, 550 U.S. at 572 (quotation marks and citation omitted). A court need not, however, accept the veracity of "mere conclusory statements." *Iqbal*, 556 U.S. at 678. Second, in light of the well-pleaded factual allegations, the court must determine whether "a complaint states . . . a plausible claim for relief." *Id.* at 679.

## III. Analysis and discussion

To prevail on a tortious interference with a contract claim,[5] a plaintiff must prove "(1) the interference was with an existing contractual or business right; (2) such interference was malicious and wrongful; (3) the interference was neither justified, privileged nor excusable; and (4) the interference proximately caused damage." *Wilspec Techs., Inc. v. DunAn Holding Grp., Co., Ltd.*, 2009 OK 12, ¶ 15, 204 P.3d 69, 74; *see also* Restatement (Second) of Torts § 766 (Am. Law Inst. 1979) (adopted by the Oklahoma

---

[5] Oklahoma also has adopted two additional species of a tortious interference with a contract claim based in § 766A and § 766B of the Restatement (Second) of Torts. *See Hankins v. Welch State Bank*, No. 14-CV-398-CVE-PJC, 2014 WL 5472753, at *2 (N.D. Okla. Oct. 28, 2014). Because Plaintiff asserts a § 766 claim, the Court addresses only this variety of the tort herein.

5

Supreme Court). These "elements . . . help to determine whether Plaintiff has set forth a plausible claim." *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012). Of course, at this stage, Plaintiff need only plead a plausible claim, not prove it. *See Twombly*, 550 U.S. at 570.

Audatex first challenges whether Plaintiff has pleaded interference (part of the first element of the tort). To interfere, "the defendant's conduct must be sufficient to establish 'inducing or otherwise causing' another party to breach the contract." *Architects Collective v. Gardner Tanenbaum Grp., L.L.C.*, No. CIV-08-1354-D, 2010 WL 2721401, at *3 (W.D. Okla. July 6, 2010) (quoting Restatement (Second) of Torts § 766). "'Inducing' is defined as applicable to situations in which a party to the contract is free to choose between two courses of conduct, and the interferer causes him to choose one course of conduct. 'Otherwise causing' applies to circumstances in which the interferer's conduct requires the contracting party to breach the contract." *Id.* (citations omitted) (quoting Restatement (Second) of Torts § 766 cmt. h). In addition, "[t]o be subject to liability for tortious interference, 'the actor must have knowledge of the contract with which [it] is interfering and of the fact that [it] is interfering with the performance of the contract.'" *Id.* (emphasis omitted) (quoting Restatement (Second) Torts § 766, comment i).

Here, Plaintiff alleges that Audatex was aware of her contract with PGAC (*see* Pet. ¶ 76, Doc. No. 1-2), that Audatex likewise knew the Autosource valuation would be used to determine the amount paid by PGAC to Plaintiff under the contract (*see id.* ¶ 77), and that Audatex knew that the Autosource valuation undervalued the total loss valuation of the vehicle (*see id.* ¶ 78). In that PGAC was necessarily choosing from nearly infinite

possible amounts to pay Plaintiff under the insurance policy, Plaintiff has pleaded that the Autosource valuation—upon which Plaintiff alleges PGAC relied in choosing what to pay her on her insurance claim—caused PGAC to choose a certain course of conduct (here, the amount to pay). This is sufficient to plead the first element of a tortious interference with contract claim.

Audatex next argues (addressing both the second and third elements of the tort) that Plaintiff has not alleged malicious behavior and that Audatex's actions were justified or privileged. "Malice . . . is the intentional performance of a wrongful act without justification or excuse." *Morrow Dev. Corp. v. Am. Bank & Trust Co.*, 875 P.2d 411, 416 (Okla. 1994). Similarly, for conduct to be privileged—and therefore unable to constitute tortious interference—it must satisfy § 773 of the Restatement (Second) of Torts, which states:

> One who, by asserting in good faith a legally protected interest of his own or threatening in good faith to protect the interest by appropriate means, intentionally causes a third person not to perform an existing contract . . . does not interfere improperly with the other's relation if the actor believes that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction.

*Morrow Dev. Corp.*, 875 P.2d at 416 (alteration in original) (emphasis omitted) (quoting Restatement (Second) of Torts § 773). Said differently, "it is not unlawful for one to interfere with the contractual relations of another if this is done by fair means, if it is accompanied by honest intent, and if it is done to better one's own business and not to principally harm another." *Id.* at 416 n.21 (quotation marks and citation omitted). The

7

second and third elements of the tort may bear on one another. *See Hankins*, 2014 WL 5472753, at *3 n.3.

Audatex principally relies on two opinions, *Hankins* and *Morrow Development Corp.*, both of which are distinguishable. In *Hankins*, a tortious breach of contract claim against a bank was dismissed to the extent it was based on the bank declining to finance the purchase of a house by the bank's customers from the plaintiff because of potential structural issues revealed by a contractor's inspection of the property. *See id.* at *1. The refusal to finance the home purchase was "primarily intended to benefit [the bank's] own economic interests" and to "avoid making a loan without acceptable collateral" (due to the home's apparent structural problems), so any effect the bank's actions had on the plaintiff's contract to sell the home to the bank's customers was incidental to the bank's primary purpose. *Id.* at *4. The bank's action was, accordingly, privileged. *See id.*

In *Morrow Development Corp.*, a bank entered into a deed-in-lieu of foreclosure transaction with its customer related to a real estate development plan that was not succeeding. *See* 875 P.2d at 413. The customer had entered into a management contract with an experienced land developer for the latter to serve as project manager, and the project manager alleged that the bank's demanding additional security, refusing to fund additional advances, threatening foreclosure, and entering into the deed-in-lieu transaction all interfered with the contract he had with the bank's customer. The Oklahoma Supreme Court determined that no evidence was presented at trial that the bank's primary intent was to interfere with the management contract because "[the bank's] acts were clearly intended to benefit and support [its] legitimate economic interests"—e.g., not having insufficient

security for its loan and not extending additional funding to a failing project which might not be repaid. *Id.* at 417.

Here, Plaintiff alleges more than Audatex simply fulfilling its obligation to PGAC and GAIS by providing them with the Autosource valuation or protecting its own economic interests. Plaintiff alleges that Audatex, through its software program, intentionally used non-comparable vehicles, intentionally applied a typical negotiation deduction resulting in the undervaluation of the comparator vehicles, and intentionally obscured how the conditions of a vehicle are evaluated to adjust the vehicle's market value, all with the eventual purpose of misleading insureds regarding the values of their vehicles. Had Plaintiff alleged that Audatex's development of an Autosource valuation alone tortuously interfered with her insurance contract, this case might fit within *Hankins* and *Morrow* because it would allege nothing more than the motive-free performance of a business function by Audatex. But Plaintiff's allegations go beyond that, and the Court finds that Plaintiff has adequately alleged that Audatex acted maliciously and without justification or pursuant to a privilege. *See Tullius v. Metro. Prop. & Cas. Ins. Co.*, No. CIV-10-272-M, 2010 WL 3259837, at *3 (W.D. Okla. Aug. 17, 2010). That Audatex's actions were pursuant to a contract it had with PGAC does not automatically and necessarily inoculate it from a tortious breach of contact claim at the pleading stage. *See Morrow Dev. Corp.*, 875 P.2d at 416 n.21 (indicating that for actions to be privileged or justified, they must be "done by fair means, . . . accompanied by honest intent, and . . . to better one's own business and not to principally harm another." (quotation marks and citation omitted)).

Audatex ultimately may prevail on Plaintiff's tortious breach of contract claim (or it may not) when additional evidence may be considered by the Court at a later stage of this proceeding. But the only question in front of the Court at this time is whether Plaintiff has adequately pleaded such a claim. *See Skinner v. Switzer*, 562 U.S. 521, 529-30 (2011). That, the Court finds, Plaintiff has done.

## IV. Conclusion

IT IS THEREFORE ORDERED that Audatex's Motion to Dismiss [Doc. No. 19] is DENIED as stated herein.

IT IS SO ORDERED this 23rd day of July, 2019.

_____
SCOTT L. PALK
UNITED STATES DISTRICT JUDGE